756 So.2d 644 (2000)
STATE of Louisiana, Appellee,
v.
Paul BRISCO, Appellant.
No. 33,179-KA.
Court of Appeal of Louisiana, Second Circuit.
April 5, 2000.
*645 Amy C. Ellender, Louisiana Appellate Project, Counsel for Appellant.
Richard Ieyoub, Attorney General, William R. Coenen, Jr., District Attorney, Penny Douciere, Assistant District Attorney, Counsel for Appellee.
Before BROWN, STEWART and KOSTELKA, JJ.
BROWN, J.,
Defendant, Paul Brisco, was charged with unauthorized entry of an inhabited dwelling, a violation of La. R.S. 14:62.3. A *646 jury found defendant guilty as charged and he was given a six-year hard labor sentence. After defendant was adjudicated a fourth felony habitual offender, his previous sentence of six years was vacated and he was sentenced to 40 years at hard labor without benefit of probation or suspension of sentence. Defendant was granted an out-of-time appeal. Finding no error, however, we affirm defendant's conviction and sentence.

FACTS
Defendant, Paul Brisco, was a longtime acquaintance of Demetria Parker and had visited her home at 130 Tweedle Street in Delhi, Louisiana, on numerous occasions. He was familiar with the layout of the Parker home and knew what vehicle Mrs. Parker drove when she left home. In April 1998, Demetria Parker lived in her Tweedle Street home with her three daughters: seven-year-old Whitley, thirteen-year-old Amanda and nineteen-year-old Kendria, who is a brain-damaged quadriplegic. Mrs. Parker had three sitters that she used to care for Kendria when she was away, two of whom were sisters, Regina and Rashonda ("Shone") Leggins, who rotated turns sitting with Kendria. A few months prior to the instant crime, Mrs. Parker decided that she did not want defendant to come into her home again or to be near her children. Mrs. Parker had heard that defendant was making inappropriate sexual remarks about her and her thirteen year-old daughter, Amanda. Besides personally warning him to stay away, Mrs. Parker also filed a complaint with the Delhi Police Department on February 23, 1998. Police Chief Rufus Carter met with defendant and instructed him to stay away from the Parker home. Mrs. Parker's sitters thereafter informed her that defendant had since gained access to her home while she was at work.
Despite these warnings, defendant again went to the Parker home late in the evening of April 6, 1998. Mrs. Parker was away from home visiting her uncle and her three daughters were home alone. Regina Leggins, one of Kendria's sitters, left the Parker home at about 10:00 or 10:15 p.m. to return to her own residence located just a few houses down the street. Thirteen-year-old Amanda, the only one awake at the time, was watching television in the den and seven-year-old Whitley was asleep nearby on the couch. Amanda heard someone at the utility room door which opens onto the carport outside. She opened the door to see defendant standing outside on the lighted carport. Defendant told Amanda to let him in the house. Amanda told defendant to leave, but he tried to pull the door open to get inside. The 5'1" Amanda managed to "yank" the door away from the bigger defendant and close and lock the door. After defendant left the doorway, Amanda called her uncle's house to speak to her mother, but was told that Mrs. Parker had already left.
Amanda went back to the den and began watching television again but was disturbed by a noise coming from one of the bedrooms in the back of the house. She then heard a sound coming from the room belonging to her sister Kendria. Amanda went to Kendria's room where she saw defendant standing beside Kendria's bed. The light was on in Kendria's room and Amanda was able to clearly identify the intruder as defendant, having known him since she was a little girl. Defendant tried to "hide a little" and then walked out of the room to an area in the house between the living room and the den. Defendant pulled Amanda's right arm and she "yanked" it back. When he pulled her arm again, she pushed him. Defendant stepped into the living room, still "grabbing" Amanda's arm. The teen got a tall ceramic cat and threatened to hit defendant with it. This tussle occurred near the sleeping Whitley, who did not awaken. Defendant then hurried and left the house through Amanda's window.
Amanda identified a diagram introduced at trial as accurately depicting the layout of her home at Tweedle Street and *647 also identified pictures reflecting its appearance. She pointed out that her bedroom was bedroom number two on the diagram and Kendria's bedroom was bedroom number one. Amanda testified that Kendria's bedroom was closer to the den where she was watching television that night and her bedroom was further away. The window to her bedroom was open and cracked and there were leaves on the floor. She identified the carport door as the door her family uses to go in and out of the house.
There was an in-court comparison of defendant's and Amanda's respective sizes; Amanda stated that she was 5'1" tall and stood alone before the jury. Amanda related that defendant was bigger than her, but not as big as the defense attorney. The state questioned Amanda about having been adjudicated as a juvenile delinquent for using her mother's car without permission. Amanda stated that she had nothing against defendant and had no reason to make up a lie about him.
Mrs. Parker found Amanda to be very upset when she arrived home shortly after defendant's escape. Amanda told her mother about the intrusion by defendant. She was still holding the ceramic cat and had armed herself with a knife. Mrs. Parker saw that the curtains to Amanda's bedroom window were pushed back and that there were leaves and grass on the floor below the window. She thought the window was locked, but the lock must have gotten "messed up," because when she checked it while the officers were there, it pushed open although it was supposed to be locked. Whitley was still asleep on the couch and Mrs. Parker noted that she was not taking any medication. Mrs. Parker stated, "when all my children sleep, they sleep." Mrs. Parker went to get the sitter, Regina Leggins, to stay with her daughters so that she could go to the police station to report the intrusion.
Mrs. Parker stated that the diagram introduced into evidence at trial did not accurately reflect the layout of her house. She stated that it was possible for someone to go from Amanda's room into Kendria's room through the hallway (which is not depicted in the diagram) without entering the living room or den area of the home. Mrs. Parker also stated that there were three doors in her house leading outside, one from the kitchen that leads to the carport, one in the living room that leads to the front and one in the dining room that leads to the back yard. Mrs. Parker testified that Amanda's room could be seen from the living room, although the window in her room could not be seen from the living room.
Mrs. Parker reiterated at trial that defendant did not have permission to enter her home on the night of the intrusion. She also identified defendant as the person she knows as Paul Brisco and affirmed that he was the person she told not to come back to her home.
Mrs. Parker testified that she had no reason to think that her daughter was lying about the intrusion and that she believed Amanda's story because she was "too hysterical." Mrs. Parker admitted that she had problems with Amanda's attitude in the past and when asked if she were familiar with Amanda's reputation for veracity, Mrs. Parker stated, "all children lie sometimes." Mrs. Parker denied having any problems with Amanda seeing older boys and stated that as far as she knew, Amanda did not have a boyfriend.
Regina Leggins, Kendria's sitter, testified that she left the Parker home at about 10:15 p.m. on the night of the intrusion. She stated that she lived with her sister Shone at her sister's apartment which was three houses down from the Parker home. Regina stated that defendant also came to her home on the night of the intrusion shortly before 11:00 p.m. Defendant knocked on the door and she opened it. Defendant asked for Shone and Regina told him that her sister was asleep. Regina stated that she quickly closed and locked the latch to the door. She thought *648 that it was strange for defendant to be visiting her sister. According to Regina, defendant and her sister were on "very, very bad terms." Defendant seemed determined to get into Regina's apartment, putting his foot in the door and resisting her attempt to close the door. Defendant finally left when he heard the laughing voices of Regina's company coming from inside the apartment.
Regina testified that Mrs. Parker came to her home about five minutes after defendant left and asked her to return to the Parker home to sit with her daughters while she went to report the crime to the police. When Regina returned to the Parker home, Whitley was asleep and Amanda appeared scared, still carrying around the ceramic cat and a knife.
Sergeant Roy Williams of the Delhi Police Department investigated Mrs. Parker's complaint of an intruder in her home. The complaint was taken at 11:01 p.m. The investigation revealed that the bush outside Amanda's bedroom window had been disturbed and there were footprints in the dirt by the window, which was open. The screen to the window, which pulls off from the outside, had been removed and was lying in the bushes next to the window. Inside the house, Sgt. Williams observed some leaves and dirt by the window. A close inspection of the window showed that it was in such a condition that it was not able to be locked and in fact was unlocked. The leaves found on the floor were collected and introduced into evidence at trial. Sgt. Williams took some photographs at the crime scene, including some of the footprints, but the film was either mixed up, lost or didn't get developed. Sgt. Williams did not take fingerprints at the scene, because, "I have a dog and the dust messes with his nose." At the scene, Sgt. Williams found Amanda to be very talkative and upset when he interviewed her the night of the intrusion. He identified the written complaint regarding the intrusion and the document was introduced into evidence at trial.
Delhi Police Chief Rufus L. Carter corroborated that Mrs. Parker made a complaint against defendant on February 23, 1998, requesting that defendant stay away from her house at all times. Chief Carter was part of the investigation the night of the intrusion. Chief Carter corroborated Sgt. Williams' account of their investigation. He stated that pictures were taken, but that he didn't know what happened to them. During the investigation, the window was closely checked. No fingerprints could be seen on the glass, so they determined that "we wouldn't get anything out of it." Chief Carter stated that, at the time, Sgt. Williams was supposed to return the next day to lift the fingerprints, but none were ever taken.
The police began searching for defendant. A few days later, defendant telephoned Chief Carter at his home. During that phone call, defendant acknowledged to the police chief that there was a warrant out for his arrest. Defendant also admitted to knocking on the door of the Parker home the night of the crime and being denied entrance, but stated that he did not commit a crime. He told Chief Carter that he then went to the Leggins' residence to see a young lady. Defendant informed Chief Carter that his probation officer would be wanting to "put me up," and "you know I'm not going to make it easy for you." Defendant also made reference to Sgt. Williams' dog, saying, "I got something for him, too." Defendant's apprehension was aided by the information obtained from Carter's caller I.D. box regarding defendant's telephone call to the chief.
A jury found defendant guilty as charged. In sentencing defendant to the maximum term of six years imprisonment, the trial court noted defendant's extensive juvenile and adult criminal record. Since reaching the age of 19 in 1989, defendant has been convicted of disturbing the peace, discharging firearms in a public place, simple theft and resisting arrest by flight. In March 1990, charges of aggravated assault *649 were dropped. In May 1990 defendant was convicted of simple burglary, given a suspended sentence of three years at hard labor and placed on three years supervised probation. On July 8, 1991, he was convicted of resisting an officer and disturbing the peace, for which he received consecutive sentences of 60 and 30 days respectively. On July 23, 1991, defendant appeared before a grand jury on a simple battery charge (for which there was no disposition). On October 11, 1991, defendant was convicted of four counts of simple burglary, and on May 6, 1992, he was sentenced to 84 months at hard labor on each count with the terms to run concurrently. On October 15, 1991, there was a grand jury proceeding on simple criminal damage to property and simple battery charges (again, there was no disposition as to these charges). Defendant's probation on his May 1990 conviction of simple burglary was violated and the sentence of three years was imposed to run concurrently with any other sentences.
On April 29, 1995, defendant was convicted of disturbing the peace and resisting arrest and he paid a fine in city court. On June 17, 1995, he was convicted of possession of a firearm by a convicted felon and resisting by flight. He was sentenced in September 1995 to three years at hard labor to run concurrent with any other sentence. Finally, defendant was convicted of the instant offense of unauthorized entry into an inhabited dwelling for which he was sentenced to six years.
In sentencing defendant, the trial court completely and fully outlined the defendant's personal, educational and criminal history. The trial court noted that defendant had been incarcerated for a great deal of his life since age twelve. Defendant continued to deny the charge of unauthorized entry of an inhabited dwelling at sentencing.
Thereafter, defendant was adjudicated a fourth felony habitual offender. The state proved three predicate offenses of attempted simple burglary, four counts of simple burglary, and possession of a firearm by a convicted felon. Defendant's previous sentence of six years was vacated and he was sentenced to serve 40 years at hard labor without benefit.

DISCUSSION

Sufficiency of the Evidence
Defendant asserts that the state failed to establish all of the elements of the offense of unauthorized entry of an inhabited dwelling. First, defendant claims that the evidence does not show that he is the person who entered the Parker residence. According to defendant, there are sufficient facts in the record which create reasonable doubt as to his guilt. Defendant also urges that it is a reasonable conclusion from the evidence that he went to the Parker home looking for "Shone" Leggins, one of Kendria's sitters. Finally, defendant argues that while the evidence supports the conclusion that someone climbed through the window of Amanda's bedroom, it was only the testimony of Amanda which identified defendant as that intruder.
La. R.S. 14:62.3, which prohibits the unauthorized entry of an inhabited dwelling, provides in part:
A. Unauthorized entry of an inhabited dwelling is the intentional entry by a person without authorization into any inhabited dwelling or other structure belonging to another and used in whole or in part as a home or place of abode by a person.
The proper standard of appellate review for a sufficiency of evidence claim under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bosley, 29,253 (La.App.2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State v. Bellamy, *650 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.09/25/98), 719 So.2d 610, writ denied, 98-2723 (La.02/05/99), 737 So.2d 747.
In cases such as this, involving a defendant's claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Brady, 414 So.2d 364 (La.1982); State v. Baker, 28,152 (La.App.2d Cir.05/08/96), 674 So.2d 1108, writ denied, 96-1909 (La.12/06/96), 684 So.2d 925.
However, this court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir. 1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir. 1986), writ denied, 499 So.2d 83 (La.1987). The determination of whether the requisite intent is present in a criminal case is also for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Butler, 322 So.2d 189 (La.1975); State v. Dean, 528 So.2d 679 (La.App. 2d Cir.1988).
Furthermore, in the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a defendant's conviction. State v. Mickens, 31,737 (La. App.2d Cir. 03/31/99), 731 So.2d 463, writ denied, 99-1078 (La.09/24/99), 747 So.2d 1118; State v. Gradick, 29,231 (La.App.2d Cir.01/22/97), 687 So.2d 1071. State v. Braswell, 605 So.2d 702 (La.App. 2d Cir. 1992).
A review of the record shows that the state proved beyond a reasonable doubt the following elements of the crime of unauthorized entry of an inhabited dwelling, as set out in La. R.S. 14:62.3. First, the record shows, and it is uncontroverted, that the dwelling entered was owned by Mrs. Parker, who used it as her home and who lived there with her three daughters at the time of the offense. The testimony at trial of Mrs. Parker, Amanda Parker and Regina Leggins, the sitter, supports this fact.
Second, the record shows, and it is uncontroverted, that defendant was not authorized to enter the Parker home at the time of the offense. Mrs. Parker testified that she had previously personally forbidden defendant from entering her home. Police Chief Carter testified that he was asked by Mrs. Parker to tell defendant not to enter her home again. Amanda Parker testified that she knew that defendant was not allowed to enter her home and in fact denied him entry at the carport door the night of the offense. Even defendant himself, in his telephone call to Chief Carter, admitted going to the Parker home the night of the offense and being denied entry.
Third, the testimony of Amanda Parker, corroborated by the testimony of her mother and the investigating officers, shows that there was an unauthorized entry into the Parker home the night of the *651 offense. Amanda's bedroom window was found open immediately after the unauthorized entry was reported; there were footprints in the dirt below the window outside and leaves and dirt inside the room below the window. Physical evidence, i.e., leaves, was collected during the investigation and introduced at trial. The requisite general criminal intent can be inferred from the circumstances of the entry. Defendant's entry through a bedroom window following his unsuccessful attempt to gain access through the carport door, coupled with the established fact that defendant had been twice warned not to enter the Parker home, are sufficient support for the finding of an intentional unauthorized entry.
The final element of the offense is proof of the identity of the intruder. Amanda's testimony regarding defendant's identity as the person who gained unauthorized entry into her home was clear and unambiguous. She identified defendant as the person who was denied entry by her and as the person she later found in her home without permission. She knew defendant well and could identify him clearly on the lighted carport and again in her sister's lighted room.
Amanda was thoroughly and rigorously cross-examined at trial. Amanda's testimony was largely consistent with that of her mother, the sitter and the investigating officers. Amanda's testimony was also corroborated in part by defendant's own statement to Chief Carter that he had attempted but was denied entry into the Parker home the night of the offense. The jury obviously determined that Amanda's testimony was credible. The record does not show any internal contradiction or irreconcilable conflict between physical evidence and Amanda's testimony. Therefore, the record supports a finding that the state negated any reasonable probability of misidentification and thus carried its burden of proving that defendant was the person who committed the offense, the final element of the crime required to support defendant's conviction. This assignment of error is without merit.

Excessive Sentence
Defendant argues that his sentence of 40 years at hard labor without benefit of probation or suspension of sentence is excessive according to constitutional standards.
Specifically, defendant contends that the record fails to support the imposition of a 40-year term of imprisonment. He argues that the facts do not support the conclusion that he is the most egregious and blameworthy of offenders and notes that none of his prior convictions were crimes of violence. Defendant also contends that the trial court incorrectly found the instant offense to be an act of violence although it is not listed as such in La. R.S. 14:2.
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or is nothing more than a purposeless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Caraway, 28,769 (La.App.2d Cir.10/30/96), 682 So.2d 856, writ denied, 99-2532 (La.02/18/00), 754 So.2d 964. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, 29,519 (La.App.2d Cir.04/02/97), 691 So.2d 864.
As a general rule, maximum sentences are appropriate in cases involving the most serious violation of the offense and the worst type of offender. State v. Grissom, 29,718 (La.App.2d Cir.08/20/97), 700 So.2d 541. Also, in selecting a proper sentence, a trial judge is not limited to considering only a defendant's prior convictions but may properly review all prior criminal activity. State v. *652 Jackson, 612 So.2d 993 (La.App. 2d Cir. 1993).
Upon the adjudication of defendant as a fourth felony habitual offender under La. R.S. 15:529.1 A(1)(c)(i), defendant's possible prison sentence exposure was not less than 20 years and not more than his natural life. La. R.S. 15:529.1 G. requires that any sentence imposed under the provisions of that section be without benefit of probation or suspension of sentence.
Defendant received a mid-range prison term of 40 years without benefit upon his adjudication as a fourth felony habitual offender. Only if defendant had received the maximum sentence of life imprisonment would it be necessary that he be found to be the most blameworthy or egregious of offenders. See State v. Grissom, supra.
Defendant was sentenced according to the requirements and sentence ranges provided in La. R.S. 15:529.1 A(1)(c)(i) and G. The crimes of violence provision of La. R.S. 15:529.1 A(1)(c)(ii) was not applied in this case and did not factor into defendant's sentence as a fourth felony habitual offender. Thus, the trial court's opinion during the original sentencing proceeding, that the instant offense was an act of violence, did not affect the imposition of defendant's sentence as a fourth felony habitual offender.
Regarding the instant offense, defendant refused to admit to the crime of unauthorized entry into an inhabited dwelling at sentencing, even after his conviction by the jury. Defendant's presence in the Parker home was a potentially dangerous situation, considering the presence of the thirteen-year-old victim, the sleeping seven-year-old and the invalid young lady. This is especially true considering the testimony of Mrs. Parker regarding the sexual comments defendant had made with reference to her and her thirteen-year-old daughter.
A review of defendant's background also supports a finding that the sentence was not constitutionally excessive. By his own admission, defendant doesn't seem to be able to keep out of trouble. His offenses have been mainly against property, but his extensive criminal history includes charges and convictions for crimes in which harm to the safety of other persons was quite possible. The charges of discharging firearms in a public place, aggravated assault and possession of a firearm by a convicted felon all show potential for crimes of violence. Defendant's criminal history also shows a propensity to enter other people's homes and businesses, as witnessed by the instant conviction and his prior convictions of four counts of simple burglary. When defendant's crime and punishment are viewed in light of the harm done to society, the 40-year sentence does not shock the sense of justice and is therefore not grossly disproportionate to the seriousness of the offense. Further, it is not a purposeless infliction of pain and suffering. Thus, the sentence is not constitutionally excessive. This assignment of error is without merit.
We have reviewed the record for errors patent and found none.

CONCLUSION
For the reasons set forth above, defendant's conviction and sentence are AFFIRMED.