982 So.2d 105 (2008)
STATE of Louisiana, Appellee,
v.
Larry D. JONES, Appellant.
No. 43,053-KA.
Court of Appeal of Louisiana, Second Circuit.
February 20, 2008.
*108 G. Paul Marx, Louisiana Appellate Project, Counsel for Appellant.
William Robert Coenen, Jr., District Attorney, Penny Douciere, Assistant District Attorney, Counsel for Appellee.
Before GASKINS, DREW and MOORE, JJ.
GASKINS, J.
The defendant, Larry D. Jones, was initially charged with five counts of attempted first degree murder; count four was later amended to a charge of aggravated criminal damage to property. A jury convicted him of four counts of attempted first degree murder and acquitted him on the aggravated criminal damage to property charge. The trial court sentenced the defendant to serve the maximum sentence of 50 years in prison at hard labor without benefit of parole, probation or suspension of sentence on each count. The court ordered that the sentences be served concurrently except for the first 10 years of the sentence for count one which was to be served consecutively with the first 10 years of the sentence for count five. The defendant appealed. We affirm.

FACTS
On October 1, 2004, Robin Jones, the defendant's estranged wife, called the Franklin Parish Sheriffs Office ("FPSO") and reported that the defendant, carrying a .22 rifle, had just left her house after telling her that he had killed two people at his residence. The dispatcher sent FPSO Deputies Amos Winn and LaFayette Ainsworth to the defendant's home.
The deputies drove to the defendant's residence in separate patrol cars. Deputy Ainsworth blew the air horn on his vehicle in an effort to get the defendant's attention, and then both deputies walked up to the front door of the mobile home. Deputy Ainsworth asked the defendant to step outside and speak to them; he partially opened the door and ordered them to get off his property. Deputy Ainsworth continued to try to talk to him. The defendant then stepped fully out of his front door, armed with a scoped Ruger .22 caliber rifle which he pointed at the deputies as he again told them to leave his property.
When the deputies saw the firearm, they immediately sought cover. Deputy Winn went to the nearby tractor shed while Deputy Ainsworth concealed himself behind a farm implement near the shed. As Deputy Ainsworth was reaching cover, the defendant began firing his rifle. Because he believed that the defendant was firing toward the road, not at them, Deputy Winn did not return fire. The deputies tried to get the defendant to put down the firearm, but he continued to order the deputies to leave the property.
Still armed with the rifle, the defendant left his trailer and walked toward his truck. Deputy Winn ordered him to drop the weapon; at that point, the defendant aimed the rifle at Deputy Winn. Deputy Winn then fired his handgun in the direction of the defendant, who was about 45 feet away. The defendant did not move but continued to aim the rifle at Winn; Winn said that the defendant was apparently "waiting for me to expose myself good enough to where he can get a good bead on me."
The defendant got into his truck, braced the rifle on the door, and continued to aim his rifle at the shed where the deputies *109 were located. He was apparently unable to see them. Instead of leaving the property, the defendant drove the truck toward the shed, at which point the deputies moved around to another side of the shed in an effort to stay behind cover. As the deputies moved, the defendant continued to maneuver his truck to get closer to them; however, he was unable to get them into the open. Eventually, he gave up and drove away in his truck.
Ty Britt, the police chief of the Town of Gilbert, responded to the deputies' radio call for assistance. Chief Britt positioned his car across Prather Road, the defendant's escape route. Britt, standing next to his car, attempted to get the defendant to stop, but the defendant drove his truck into the ditch alongside the road, struck the driver's side door on Chief Britt's patrol car, and kept going.
FPSO Deputy Kevin Cobb was driving up onto the scene as the defendant passed Britt, and he began to pursue the defendant. When Cobb reached the intersection of Prather Road and Highway 128, he saw the defendant's truck stopped in the roadway about 75 yards from him. The deputy then saw the defendant sitting in the truck; he had the rifle, resting on the door of his truck, pointing directly at the deputy. Deputy Cobb ducked down inside his vehicle, and the defendant drove away.
Cobb then resumed his pursuit of the defendant, who drove to the parking lot of Turkey Creek Baptist Church. Franklin Parish Sheriff Steve Pylant and Deputy Lester Thomas also joined the pursuit and arrived at this location with Deputy Cobb. Sheriff Pylant, who knew the defendant and thought he could talk to him, came over to Deputy Cobb and asked him not to shoot the defendant. The defendant was still in his truck pointing the rifle out of the window. Deputy Cobb ordered the defendant to drop the rifle; however, the defendant accelerated and turned his truck in order to point the rifle at Cobb and the sheriff. Pylant dove back into his vehicle for cover as the defendant began firing at him; at the same time, Deputy Cobb, beside and behind Pylant's vehicle, began firing his pistol at the defendant. Sheriff Pylant's vehicle was facing the defendant, and one bullet from the defendant's rifle struck the front grill of Pylant's vehicle.
During the shootout, Pylant's face was cut by either a bullet fragment or flying glass from a shot that hit one of his windows. Some bullet fragments from inside the sheriffs vehicle were determined to be from a .40 S & W caliber bullet fired by an officer. A firearms examiner opined that the holes in the sheriffs windshield were most likely caused by bullets fired by an officer. One shot fired by Deputy Cobb grazed the side of the defendant's head, causing him to cease firing and drop his rifle. The rifle was empty of ammunition when it was recovered. Two .22 caliber shell casings were recovered from the interior of the defendant's truck; testing revealed that they were fired from the defendant's rifle.
The defendant fled in his truck. Deputies Cobb and Thomas pursued him at speeds over 100 miles per hour. Although Sheriff Pylant initially joined the pursuit, the condition of his vehicle forced him to stop; he later sought treatment at the hospital. The defendant drove to his wife's house, exited his truck and tried to kick the front door open. The deputies arrived and arrested him. He was advised of his Miranda rights by Deputy Cobb.
EMT Danny Posey responded to the scene to treat the defendant's injuries. Posey loaded him into the ambulance while asking him questions to determine the extent of his head injury; Posey said that the defendant was able to answer his questions appropriately. Posey believed that *110 the defendant was not seriously injured and that he was not under the influence of alcohol or drugs. During the ambulance ride to the hospital, the defendant told Posey that he had tried "to kill Sheriff Pylant . . . for messing with his wife."
FPSO Deputy Mark McMurray was in the hospital emergency room and heard the defendant say to all the people there that "he had video tape evidence that Sheriff Pylant and Kevin Cobb had slept with his wife." McMurray also heard the defendant say that he meant to kill the sheriff and Cobb but did not mean to kill the first two deputies. The emergency room nurse testified that the defendant appeared to be alert and oriented when he was admitted, and she did not observe evidence that he was under the influence of alcohol or drugs. Analysis of the defendant's blood revealed no evidence that he had consumed alcohol before these events; the analysis did show that the defendant had Valium in his system. The testing did not reveal the presence of cocaine, but there was not enough blood available for the lab to do a more sensitive test that might have revealed the presence of that drug. Hospital records show that the defendant told medical personnel that he "shot at police in an attempt to make the police kill him. . . ."
The defendant was charged with five counts of attempted first degree murder for his actions against Sheriff Pylant, Chief Britt, and Deputies Ainsworth, Winn and Cobb. However, count four of the bill of information, the charge pertaining to Chief Britt, was later amended to a charge of aggravated criminal damage to property. The defendant pled not guilty and not guilty by reason of insanity.
According to the trial testimony, the defendant had some history of unusual or erratic behavior. Sheriff Pylant knew that the FPSO had been to the defendant's residence on numerous occasions but was not aware that he had any mental problems. Prior to this incident, the sheriff heard through a mutual friend, banker Brian Wilson, that the defendant had a problem with the sheriff. Mr. Wilson testified that the defendant was always reliable in his business dealings with the bank, but one day the defendant told him that:
[Sheriff] Steve [Pylant] had got his truck dirty and that Steve had his truck keys and that Steve was on his way out there to  Steve was on his way out there to bring him his truck keys and that when Steve got there, that he was going to make him wash his truck and he was going to beat him up and he was going to shoot him.
The sheriff later met with the defendant to clear up the matter; however, the defendant expressed no hostility toward him at the meeting.
After the defendant was incarcerated for the instant offenses, Mr. Wilson visited him at the jail and noted that the defendant had wrapped himself in a black blanket and had to be guided as he walked because he was "just like running into walls. . . ." as if he didn't know where he was or what he was doing. Mr. Wilson said that the defendant was loudly "talking real crazy." However, he also talked softly and plainly "a little bit" to tell Mr. Wilson, "don't worry about me, I know what I'm doing." Wilson was aware that the defendant had tried to commit suicide in the past.
The defendant's wife testified that he was a good husband and farmer early in their marriage but later became addicted to crack cocaine, Lortab and Xanax. She said that the defendant began lying frequently and hallucinating and, on one occasion, shot up their house with a shotgun. According to her, the defendant had undergone inpatient psychiatric treatment in *111 the past, shot himself under the chin once in a suicide attempt, and also drove his truck into a bridge railing in what might have been a suicide attempt. Mrs. Jones said that after commencing to use cocaine, the defendant became paranoid and believed that "the law" was after him. She said that the defendant sometimes used $400 to $500 worth of crack cocaine per day. Mrs. Jones also testified that on the morning of October 1, 2004, she saw him smoking crack in her bathroom.
The defense presented the testimony of Dr. Philip Scurria, one of the two doctors who examined the defendant and determined that he was competent to stand trial. Dr. Scurria testified that the defendant told him that he had consumed a large amount of crack cocaine and Xanax shortly before the instant offenses. He also told the doctor that he had no memory of the events. However, the doctor noted that the reports from the hospital, which stated that the defendant was alert and oriented, and the defendant's ability to control his vehicle were inconsistent with his assertion that he had taken a large amount of cocaine and Xanax.
Deputy Cobb testified at trial that the defendant did not appear to be under the influence of alcohol or drugs. He also noted that during the car chase, the defendant seemed to be in complete control of his vehicle and drove exceptionally well. Deputy Thomas, who had specialized training regarding alcohol and drugs as a DARE officer, likewise testified that the defendant did not appear to be under the influence of alcohol or drugs. He also characterized the defendant as driving "quite well" considering the high speeds of the chase.
The jury convicted the defendant of the four counts of attempted first degree murder of Sheriff Pylant and Deputies Ainsworth, Winn and Cobb. However, it acquitted him of the aggravated criminal damage to property related to the incident with Chief Britt's vehicle.
The trial court imposed the maximum sentence of 50 years imprisonment at hard labor, without benefits, on each count, with all sentences to run concurrently except for the first 10 years on count one and count five.[1] The court denied the defendant's motion to reconsider sentence.
The defendant appealed.

SUFFICIENCY OF EVIDENCE

Law
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, XXXX-XXXX (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 2002-2634 *112 (La.9/5/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, XXXX-XXXX (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Parker, 42,311 (La. App.2d Cir.8/15/07), 963 So.2d 497; State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 1998-2723 (La.2/5/99), 737 So.2d 747.
La. R.S. 14:27 provides, in part:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
La. R.S. 14:30 provides, in part:
A. First degree murder is the killing of a human being:
. . . .
(2) When the offender has a specific intent to kill . . . a . . . peace officer . . . engaged in the performance of his lawful duties, or when the specific intent to kill . . . is directly related to the victim's status as a . . . peace officer. . . .
Specific intent to commit a crime is an element of an attempted offense. La. R.S. 14:27. Hence, a conviction of an attempted offense must rest upon sufficient proof that the offender actively desired to cause the prescribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose and tending directly toward the accomplishing of his object. La. R.S. 14:10, 14:27. See State v. Cheatham, 38,413 (La.App.2d Cir.6/23/04), 877 So.2d 164, writ denied, 2004-2224 (La.6/24/05), 904 So.2d 717. The state must prove that the offender had the specific intent to kill, not merely intent to cause great bodily harm, in order to convict a defendant of attempted murder. State v. Butler, 322 So.2d 189 (La.1975).
Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Kahey, 436 So.2d 475 (La. *113 1983); State v. Allen, 41,548 (La.App.2d Cir.11/15/06), 942 So.2d 1244, writ denied, XXXX-XXXX (La.12/7/07), 969 So.2d 619; State v. Wilson, 42,440 (La.App.2d Cir.9/19/07), 965 So.2d 992. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. State v. Davies, 35,783 (La.App.2d. Cir.4/5/02), 813 So.2d 1262, writ denied, XXXX-XXXX (La.5/9/03), 843 So.2d 389; State v. Lindsey, 543 So.2d 886 (La. 1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. Ellis, 28,282 (La.App.2d Cir.6/26/96), 677 So.2d 617, writ denied, 96-1991 (La.2/21/97), 688 So.2d 521.
The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Cheatham, supra; State v. Allen, supra.
The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Dooley, 38,763 (La.App.2d Cir.9/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.2/18/05), 896 So.2d 30; State v. Brooks, 36,855 (La.App.2d Cir.3/5/03), 839 So.2d 1075, writ denied, XXXX-XXXX (La.11/7/03), 857 So.2d 517.

Discussion
The defendant urges that the evidence is insufficient to prove his specific intent to kill the victims. Specifically, he points to the evidence that he never fired directly at Deputies Winn or Ainsworth and the lack of physical evidence showing that he fired more than one shot at Sheriff Pylant.
As to the incident involving Deputies Winn and Ainsworth, the defendant urges that the evidence shows, at most, that he intended to act in such a way as to make the first two responding officers shoot him. Although the evidence could be interpreted to indicate an attempted "suicide by cop," the evidence also showed that the defendant did not disengage from his assault on Deputies Winn and Ainsworth after the initial contact ended and the deputies ran for cover. Instead of surrendering or leaving the scene after firing shots toward the road, the defendant got into his truck, which provided him with partial cover from return fire, aimed his rifle at the officers, and maneuvered the truck around the shed where the deputies were hiding. Only when the deputies' skill at evasion exceeded the defendant's patience did the defendant withdraw from the situation. This is clearly evidence sufficient for a rational jury to find that the defendant specifically intended to kill Deputies Winn and Ainsworth.
Additionally, during the chase involving Deputy Cobb, the defendant positioned his vehicle 75 yards away from the road, remained in his truck and aimed his rifle at the intersection where Deputy Cobb had to enter the highway. This is plainly evidence of the defendant's intent to shoot, rather than be shot by, Deputy Cobb.
The evidence showed that the defendant managed to shoot the front of Sheriff Pylant's vehicle during the shootout at the church despite coming under fire from Deputy Cobb. If the defendant was only trying to commit suicide, there was no need for him to shoot at the sheriff at all. Also, the defendant made several statements after the shooting in which he declared his intention to kill the sheriff. Again, a rational finder of fact could easily conclude that the defendant specifically intended to kill Sheriff Pylant.
*114 Finally, the defendant's behavior at the time of his arrest and hospitalization, his ability to drive his vehicle with skill during the high-speed chases, and the results of the drug testing together show that the jury could reasonably have found beyond a reasonable doubt that the defendant's mental state was such that he was capable of forming the requisite intent to kill during his crime spree.
This assignment of error is without merit.

EXCESSIVE SENTENCE

Law
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Hampton, 38,017 (La.App.2d Cir.1/28/04), 865 So.2d 284, writs denied, XXXX-XXXX (La.3/11/05), 896 So.2d 57, and 2004-2380 (La.6/3/05), 903 So.2d 452. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Haley, 38,258 (La. App.2d Cir.4/22/04), 873 So.2d 747, writ denied, 2004-2606 (La.6/24/05), 904 So.2d 728.
There is no requirement that specific matters be given any particular weight at sentencing. State v. Shumaker, 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277, writ denied, XXXX-XXXX (La.9/28/07), 964 So.2d 351; State v. Jones, 33,111 (La. App.2d Cir.3/1/00), 754 So.2d 392, writ denied, XXXX-XXXX (La.2/2/01), 783 So.2d 385.
Second, a sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, XXXX-XXXX (La. 1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La.1992); State v. Robinson, 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379; State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864.
As a general rule, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses. State v. Woods, 41,420 (La.App.2d Cir.11/1/06), 942 So.2d 658, writs denied, 2006-2768 and 2006-2781 (La.6/22/07), 959 So.2d 494; State v. Brisco, 33,179 (La. App.2d Cir.4/5/00), 756 So.2d 644, writ denied, XXXX-XXXX (La.5/25/01), 792 So.2d 749; State v. Grissom, 29,718 (La.App.2d Cir.8/20/97), 700 So.2d 541.
When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served *115 consecutively. La. C. Cr. P. art. 883. Concurrent sentences arising out of a single course of conduct are not mandatory, and it is within a trial court's discretion to order sentences to run consecutively rather than concurrently. State v. Boudreaux, 41,660 (La.App.2d Cir.12/13/06), 945 So.2d 898, writ denied, XXXX-XXXX (La.11/2/07), 966 So.2d 591; State v. Robinson, 33,921 (La.App.2d Cir.11/1/00), 770 So.2d 868; State v. Coleman, 32,906 (La.App.2d Cir.4/5/00), 756 So.2d 1218, writ denied, XXXX-XXXX (La.3/23/01), 787 So.2d 1010.
A judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence or record. When consecutive sentences are imposed, the court shall state the factors considered and its reasons for the consecutive terms. State v. Boudreaux, supra; State v. Coleman, supra.
Among the factors to be considered are the defendant's criminal history; the gravity or dangerousness of the offense; the viciousness of the crimes; the harm done to the victims; whether the defendant constitutes an unusual risk of danger to the public; the potential for the defendant's rehabilitation; and whether the defendant has received a benefit from a plea bargain. State v. Boudreaux, supra; State v. Robinson, supra; State v. Coleman, supra.
A defendant's lack of remorse is a proper sentencing consideration. State v. Shipp, 30,562 (La.App.2d Cir.4/8/98), 712 So.2d 230, 237, writ denied, XXXX-XXXX (La.9/25/98), 724 So.2d 775; State v. Daniels, 607 So.2d 620, 625 (La.App. 2d Cir.1992).

Discussion
The trial court imposed the maximum sentence of 50 years imprisonment at hard labor, without benefit of parole, probation or suspension of sentence, on each of the four counts of attempted first degree murder; the court also ordered that all sentences run concurrently except for the first 10 years on two of the counts, which were to be served consecutively to each other. The defendant urges that the trial court imposed excessive sentences and in particular should not have imposed the 10-year consecutive terms. The defendant argues that the trial court should have given more consideration to, and sympathy toward, his drug use and psychiatric problems in fashioning the sentences for the defendant.
In fashioning the appropriate sentences for the defendant, the trial court went to great lengths to follow the guidelines in La. C. Cr. P. art. 894.1. The court recounted the facts of the offenses in detail. Also recited were the indicators of the defendant's complete lack of remorse for his actions. Among other things, the defendant told the probation and parole officer preparing the pre-sentence investigation (PSI) report that "I was found guilty of something I didn't do." During the trial, the defendant even directed an obscenity toward one of his victims, Sheriff Pylant.
The trial court considered a PSI report before sentencing the defendant. That report reflects that the defendant was born in 1958 and dropped out of school in the ninth grade to work on his father's farm. After a brief period of other employment as a young adult, the defendant was a farmer for his entire working life. By all accounts he was a successful farmer, owning a home, 42 acres of land and farm equipment. The defendant is apparently in poor physical health, having arthritis, breathing trouble, and back and kidney problems.
*116 Moreover, the defendant had no criminal record until 2002 when he was charged with a minor motor vehicle violation. In 2003, he was charged in Franklin Parish with aggravated assault and attempted aggravated kidnapping, but those charges were dropped. In 2004, he had several encounters with law enforcement; in January, he was charged with hit-and-run, DWI-1st offense, running a stop sign and resisting an officer by flight; he was convicted of all but the stop sign violation. In February, the defendant was convicted of another DWI and speeding. During the search of his home after the instant offenses, officers found cocaine, and he was charged with possession of cocaine.
The court considered all of this and also took into account the defendant's mental state, including his attempts at suicide and his psychiatric treatment, as well as the loss of his marriage and his farm. However, the court relied most heavily on the extraordinary nature of the defendant's offenses in deciding upon the sentence. The defendant got into two gunfights with several law enforcement officers and engaged in two high-speed car chases with those officers, actions that placed the lives of numerous persons in jeopardy. The court observed that the defendant's conduct was completely unprovoked and unjustified, and that the defendant was the worst kind of offender because he attempted to kill numerous law enforcement officers. Further, the court said that the defendant could have ceased his actions at several points, yet persisted in choosing the most violent and dangerous course of action. The court found that the defendant continues to present a danger to the community, that his imprisonment will not seriously affect his family, and that he had previously used a firearm in the kidnapping offense which the victim decided not to pursue.
In mitigation, the court considered the defendant's crime-free life until 2002, his former status as a good farmer, his poor health, his mental problems and substance abuse. The court pointedly noted its belief that the defendant knew the difference between right and wrong at the time he committed these crimes. The court also observed that the defendant had lost his farm and his family, but observed that "[n]o one has stepped forward to say a good word for this defendant."
The court correctly stated that the minimum sentence for attempted first degree murder of a police officer was 20 years imprisonment at hard labor without benefits and that 50 years without benefits was the maximum sentence. The court found that the maximum sentences were appropriate for this defendant. It stated that it was imposing 10 years of two of the sentences consecutively because there were two separate shooting incidents separated by a high-speed chase.
The court's extensive reasons for judgment fully satisfy the requirements of La. C. Cr. P. art. 894.1 and are ample justification for the sentences. In a short period of time, the defendant tried to kill four law enforcement officers and engaged them in two high-speed pursuits. It is difficult to imagine a more serious case of attempted first-degree murder.
This assignment of error is without merit.

PRO SE BRIEF
In addition to the two assignments of error raised on appeal by defense counsel, the defendant filed a pro se brief in which he raised three additional issues.

Prosecutorial misconduct
In this assignment of error, the defendant argues that the prosecutor *117 knowingly presented evidence and solicited testimony that was misleading or false.
Knowingly using perjured testimony is grounds to vacate a conviction "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). If a prosecutor knowingly uses relevant but false testimony to obtain a conviction, that conviction violates an individual's due process right under the Fourteenth Amendment. Napue v. Illinois, 360 U.S. 264, 269-70, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).
In our review of the record, which included the entirety of the testimony, we observed no instance that could fairly be described as a deliberate attempt by the prosecutor to put false or misleading testimony before the jury. The defendant points out a de minimis discrepancy in the testimony of Danny Posey, the EMT who treated the defendant immediately after his arrest, that appears between Posey's testimony at the suppression hearing and the trial. However, on both occasions, the EMT testified that the defendant admitted that he was trying to kill the sheriff because of his belief that the sheriff was having an affair with his wife.
The defendant also argues that the prosecutor misrepresented the facts during the examination of witnesses regarding the shootout at the church. This testimony was thoroughly and vigorously tested through cross-examination. Generally the testimony was favorable to the defendant in that it tended to show that the shots that broke the glass in the sheriff's car came from a deputy's gun, not from the defendant.
There is no evidence of prosecutorial misconduct in this record, much less such misconduct that would amount to a reversible error.
This assignment of error lacks merit.

Sequestration of witnesses
The defendant argues that he was prejudiced by the trial court's alleged failure to effectively separate the witnesses during the trial. On the first day of trial, there were three witnesses. The court did not formally place the witnesses under the rule of sequestration at the beginning of the trial, but the record reflects that none of these witnesses heard the testimony of the others. On the second day of trial, the court put the witnesses under the rule, subject to the exception cited by the prosecutor for witnesses who are the victims of a crime. The defendant did not object to the use of that exception.
La. C.E. art. 615 provides, in part:
A. As a matter of right. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion.
B. Exceptions. This Article does not authorize exclusion of any of the following:
. . . .
(4) The victim of the offense or the family of the victim.[2]
*118 It is not clear from the record which, if any, of the remaining witnesses may have heard the others prior to testifying, but the testimony of the law enforcement witnesses contains several minor differences that strongly suggests that these witnesses were relying on their memory of events, rather than the testimony of other witnesses, for their own testimony. Moreover, the defendant did not object at trial to any exception to sequestration that may or may not have been made for the victims of the offense; as a result, he is precluded from raising any error in that regard on appeal. La. C. Cr. P. art. 841.
This assignment of error is without merit.

Sanity determination
The defendant, who pled not guilty and not guilty by reason of insanity, urges that his conviction must be reversed because a psychiatrist who examined him prior to trial could not make a determination of his sanity at the time of the offense. Dr. Scurria testified that the defendant was unable to say what happened at the time of the offenses because he claimed to have a "blank spot" in his memory for the time of the offenses. Consequently, the doctor testified, "I couldn't really assess what his mental capacity was at the time."
Louisiana law presumes a defendant is sane and responsible for his actions. La. R.S. 15:432. This presumption is rebuttable, however, and the defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. La. C. Cr. P. art. 652; State v. Gleason, 36,774 (La. App.2d Cir.1/29/03), 836 So.2d 1165. Legal insanity is proved if the circumstances indicate that a mental disease or mental defect rendered the offender incapable of distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14; State v. Gleason, supra. The determination of sanity is a factual matter reserved to the jury or other fact finder. State v. Gleason, supra.
Dr. Scurria and the other member of the sanity commission believed that the defendant was competent to stand trial, a finding with which the trial court agreed. Pursuant to La. C. Cr. P. art. 652, the defendant then bore the burden of proving insanity by a preponderance of the evidence. Evidence on both sides of that point was presented to the jury, and the jury  which is ultimately responsible for finding this fact  demonstrated by its verdicts that it rejected the defendant's claim that he was insane at the time he committed these offenses.[3] There was no error in the trial court's handling of the defendant's insanity defense.
This assignment of error is meritless.

CONCLUSION
The defendant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] The trial court found that counts one and two, which involved the defendant's actions against Deputies Ainsworth and Winn, were part of a common plan or scheme. It likewise determined that counts three and five concerning the gunfight with Sheriff Pylant and Deputy Cobb were part of a common plan or scheme. However, the court concluded that since the shootout at the defendant's house and the gunfight at the church were at different locations at different times with different victims, they were separate and distinct; thus, imposition of consecutive sentences was appropriate. See State v. Hayes, 602 So.2d 285 (La.App. 2d Cir.1992), where this court determined that consecutive/concurrent "split" sentences, such as the ones imposed here, are permissible.
[2] In his pro se brief, the defendant refers to a former version of this article which required a victim to give his testimony before being exempted from the exclusion order. The article was amended to its present form by Acts 1999, No. 783, § 2, which became effective January 1, 2000. Under the current law, the victims have a right to be in the courtroom and are not subject to a sequestration order. State v. Johnson, 2001-2334 (La.App. 4th Cir. 12/4/02), 833 So.2d 508.
[3] We note that the evidence presented by the state included the testimony of the defendant's banker that, when he saw the defendant in jail shortly after his arrest for the instant offense, the defendant confided in him that he "knew what he was doing"; he also assured the banker that he did not need to worry about him despite his conspicuously distressed behavior during the visit.