**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**


**23-475**


**STATE OF LOUISIANA**

**VERSUS**

**MICHAEL R. SUYDAM, JR.**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, CR-2021-19
HONORABLE  MARTHA ANN O'NEAL, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


**LEDRICKA J. THIERRY**
**JUDGE**


\*\*\*\*\*\*\*\*\*\*


Court composed of Shannon J. Gremillion, Jonathan W. Perry, and Ledricka J. Thierry, Judges.


**AFFIRMED.**

**Chad M. Ikerd**
**Louisiana Appelate Project**
**P.O. Box 2125**
**Lafayette, LA 70502-2125**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT-APPELLANT**
     **Michael R. Suydam, Jr.**


**James R. Lestage, District Attorney**
**36th Judicial District/Beauregard Parish**
**124 South Stewart Street**
**DeRidder, LA 70634**
**(337) 463-5578**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**THIERRY, Judge.**

Defendant, Michael R. Suydam, Jr., appeals his conviction and sentence on one count of attempted aggravated assault with a firearm. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

Defendant was convicted of committing an attempted aggravated assault with a firearm upon his wife Angela Doll.[1] Doll testified she and Defendant argued, and she walked to a neighbor's home to cool off. Defendant subsequently fired two gun shots from a pistol. Doll, concerned Defendant might harm himself or her dogs, returned home to find Defendant with the pistol in his mouth. The two struggled over the gun, and Defendant pointed the pistol at Doll and touched her lips with it.

Defendant was charged by bill of information filed on January 13, 2021, with aggravated assault with a firearm, a violation of La.R.S. 14:37.4. Jury selection commenced on January 23, 2023, and Defendant was found guilty of the responsive verdict of attempted aggravated assault with a firearm, a violation of La.R.S. 14:27 and La.R.S. 14:37.4. Defendant was subsequently sentenced to serve four years at hard labor and to pay a fine of $1500.

A Motion for Appeal and Designation of Record was filed and granted with this court on April 3, 2023. Counsel for Defendant sent a letter to the Beauregard Parish Clerk of Court on April 20, 2023, stating Defendant wished to withdraw his request for an appeal. On April 25, 2023, the State filed a pleading titled "State's Motion on Designation of Record or Payment of Appeal." Therein, the State requested a hearing to address whether Defendant sought an extension of time or to

---

[1]The victim's last name is spelled Doll and Dail in the record. We have used the spelling found in the bill of information.

dismiss his appeal. At a hearing held on May 22, 2023, Defendant informed the trial court that he wanted to be declared indigent. The trial court subsequently found Defendant indigent and ordered the clerk of court to notify the Louisiana Appellate Project.

Defendant is now before this court asserting four assignments of error: 1) the evidence is insufficient to support his conviction; 2) trial counsel was ineffective for failing to raise the issue of intoxication as a defense or to request a special jury instruction on the issue of intoxication; 3) his sentence is excessive; and 4) trial counsel was ineffective for failing to file a motion to reconsider sentence.

## ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, Defendant contends the State failed to sufficiently prove that he was guilty of attempted aggravated assault with a firearm. Defendant argues he should have been found guilty of a lesser charge of aggravated assault, which does not require specific intent.

Defendant was charged with aggravated assault with a firearm, which was defined by this court in *State v. Watson*, 21-725, pp. 9–10 (La.App. 3 Cir. 4/27/22), 338 So.3d 95, 101:

> Aggravated Assault with a Firearm is defined by La.R.S. 14:37.4(A) as "an assault committed with a firearm." An Assault is defined in La.R.S. 14:36 as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." A Battery is further defined as "the intentional use of force or violence upon the person of another; or the intentional administration of a poison or other noxious liquid or substance to another." La.R.S. 14:33. Therefore, Aggravated Assault with a Firearm may be correctly stated as "An attempt to use force or violence upon the person of another with a firearm, or the intentional placing of another in reasonable apprehension of receiving force or violence with a firearm."

Aggravated assault with a firearm is a general intent crime. *State v. Julien*, 09-1242, p. 8 (La.App. 3 Cir. 4/7/10), 34 So.3d 494, 499. "General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the

2

offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." La.R.S. 14:10(2).

Defendant was convicted of attempted aggravated assault with a firearm.

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

La.R.S. 14:27(A). Specific intent to commit a crime is an element of an attempted offense. *State v. Jones*, 43,053, p. 10 (La.App. 2 Cir. 2/20/08), 982 So.2d 105, 112, *writ denied*, 08-710 (La. 10/10/08), 993 So.2d 1282. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1).

> Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances and the defendant's actions. *State v. Broaden*, 99–2124, p. 18 (La.2/21/01), 780 So.2d 349, 362; *State v. Graham*, 420 So.2d 1126, 1127 (La.1982). Specific intent may be formed in an instant. *State v. Cousan*, 94–2503, p. 13 (La.11/25/96), 684 So.2d 382, 390.

*State v. Mickelson*, 12-2539, p. 6 (La. 9/3/14), 149 So.3d 178, 182–83.

In order to convict Defendant of attempted aggravated assault with a firearm, the State was required to prove Defendant had the specific intent to place Doll in reasonable apprehension of receiving a battery and committed an act in furtherance thereof.

The Defendant contends the State failed to prove he had the specific intent to commit the attempted offense. The State looks to *State ex rel. Elaire v. Blackburn*, 424 So.2d 246 (La.1982), *cert. denied*, 461 U.S. 959, 103 S.Ct. 2432 (1983), and suggests this court can review the sufficiency of the evidence to support the charged

3

offense instead of that supporting the responsive verdict returned by the jury. In

*Elaire*, 424 So.2d at 251 (footnote omitted), a plurality opinion, the supreme court

addressed responsive verdicts provided for in La.Code Crim.P. art. 814:

> The 1982 amendment adding Section C to Article 814 now gives the trial judge discretion, on motion of either side, to exclude a responsive verdict which is not supported by the evidence. Therefore, even if the offense is legislatively designated as responsive by Article 814, the defendant may timely object to an instruction on a responsive verdict on the basis that the evidence does not support that responsive verdict. If the court overrules the objection and the jury returns a verdict of guilty of the responsive offense, the reviewing court must examine the record to determine if the responsive verdict is supported by the evidence and may reverse the conviction if the evidence does not support the verdict. However, if the defendant does not enter an objection (at a time when the trial judge can correct the error), then the reviewing court may affirm the conviction if the evidence would have supported a conviction of the greater offense, whether or not the evidence supports the conviction of the legislatively responsive offense returned by the jury.

Louisiana Code of Criminal Procedure Article 814 does not set forth the

responsive verdicts for aggravated assault with a firearm. Thus, the case at bar is

governed by La.Code Crim.P. art. 815 and La.R.S. 14:27(C). In *State v. Price*, 17-

520, pp. 6–7 (La. 6/27/18), 250 So.3d 230, 233–34, the supreme court stated that the

plurality in *Elaire* did not purport to address lesser and included offenses under

La.Code Crim.P. art. 815.

The standard of review for sufficiency of the evidence is well-settled:

> A sufficiency of the evidence claim is reviewed on appeal under the standard set forth by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In that case, the United States Supreme Court explained that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781 (emphasis in original).

> Commenting on *Jackson*, the Louisiana Supreme Court cautioned that "[t]his standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521. Put simply, a reviewing court must afford great deference to a

4

> jury's decision to accept or reject the testimony. *State v. Allen*, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *Id.* at 626.

*State v. Artis*, 23-348, pp. 2–3 (La.App. 3 Cir. 12/6/23), ___ So.3d ___ (2023 WL 8440365) (alterations in original).

Angela Doll testified that she met Defendant online prior to December 24, 2003, and the two were married on January 30, 2015. On March 29 or 30, 2020, Defendant arrived home "under the influence of something." Doll indicated Defendant was drinking whiskey or vodka on the day at issue. Doll additionally stated Defendant had a drug problem and had drugs in his system that night. She described Defendant as "completely gone." Doll testified she had two or three shots of Fireball, a cinnamon flavored whiskey that was about thirty-five proof, which she said was "like drinking water," during this time.

Doll and Defendant fought, and Doll told Defendant she wanted a divorce. Doll testified Defendant threatened to beat her ass. As a result of the argument, Doll left to go to her neighbor's house to cool off. After Doll left, Defendant yelled her name in an unpleasant tone and called her phone several times. Defendant fired a gun shot into the ground. Doll then ran back home "because at this point he's got a gun and threatened his own life and the life of my hounds. I can't say exactly why I went back, other than I was terrified he was going to follow through and injure him, himself, one of those dogs, or somebody else."

Defendant subsequently stepped onto the back porch and fired a second shot. Doll was going around the fence line and saw the flash from the gun because it was dark at that time. As she went up the steps to her home, Defendant put the gun in

his mouth.  Doll testified that when she "went to grab for the gun is when it was turned to" her.  She was questioned:

> Q.      When did you try to pull the gun out of his mouth?
>
> A.      After I'd begged him to think of those that he loved most, and he still had it in his mouth and had this look in his eyes that clearly said he was not giving in at all. So it was just steadily staring -- it felt to me like staring Satan in the eyes as he's shaking. And I remember begging him to think of them -- and when he didn't I reached up for the gun and when I did I was pulling on it and so he just simply turned it on me. I'm close enough to grab the gun so --
>
> Q.      So the gun was pointed in your face now?
>
> A.      Yes, sir.

She further explained:

> Q.      When did you approach the defendant?
>
> A.      After the second gunshot.
>
> Q.      You did --
>
> A.      Because when I went up the steps -- because there was maybe, like I said twenty yards. And when I heard that shot, then I picked up speed because how do I know.
>
> Q.      And when did he put the gun in his mouth?
>
> A.      When I came up the steps to the back door to the utility room, laundry room.
>
> Q.      And that was after the second gunshot.
>
> A.      Yes.
>
> Q.      When did he point the gun at you?
>
> A.      After the second gunshot, after I came in the door and was trying to reason with him, when I went to grab for the gun is when it was turned to me.
>
> Q.      So I still am -- was it after it was in his mouth or before?
>
> A.      Yes, after.
>
> Q.      So after it was in his mouth, it was pointed at you?

6

A.    Yes.

Q.    And how far away were you at that time?

A.    Not even two feet.

Q.    And was the gun physically touching you?

A.    Yes.

Q.    Where?

A.    Right on the lips, almost to the, I wanna [sic] say the tooth line. But literally on the lips pressing.

Doll did not recall what Defendant was saying when he had the gun in his mouth. However, she subsequently testified that Defendant said he was going to take his own life.

Doll eventually got the gun away from Defendant. She described how this occurred:

A.    As we were struggling for the gun, somehow, we went from the utility room into the kitchen, which is literally not even five feet. But he was standing against the island, and we were still steadily arguing over the gun and everything else apparently. And finally -- I just couldn't think of anything else to reason with him for I simply looked him in the eyes and said, can I suck your dick. Because there is one sure way to elevate to get his mind off of it obviously. Because nothing else worked and I figured hey, I've always heard from my guys friends' [sic] what man can resist a blow job, right.

Q.    So in order to survive is that why your thought process was there?

A.    Yes, sir. Because I had tried everything else. I've tried reasoning, I've tried bargaining, I've tried reminding him of what he had and what he was steadily losing. I begged for help, I begged him, I begged his family.

Q.    And did this work to get the gun away?

A.    Yes, for a brief little bit.

After oral sex, Doll still had the gun in her pocket.

Doll subsequently went into her bedroom, and Defendant entered the room, asking where the gun was. Sometime later, Defendant wanted to have sex, and Doll

testified "it was easier to comply then [sic] have him go for a larger caliber gun . . . ." Doll "laid there and fell asleep with [Defendant's] penis right next to my mouth because that's the only way he would let me go to sleep."

Defendant left home the following day, and Doll called a friend and begged her to stay on the phone while Doll took a shower. Doll made the call in the event Defendant returned and something happened to her.

Doll indicated she was trying to get through to Defendant during the incident because "this was not the man that I knew." According to Doll, she felt very threatened at that time and was afraid of being shot. She later testified she was terrified and traumatized and cared about Defendant.

Doll was extensively questioned about why she did not leave after the initial fight and after Defendant turned the gun on her. Doll testified she did not run away because she was "surrounded by a wooded area" and was worried Defendant would shoot himself, as Defendant had threatened to do so "in the days prior to." She further said she did not run because she was terrified Defendant would shoot one of the dogs. Additionally, she knew there was nowhere for her to go because she weighed 350 pounds and used a cane. Also, the car keys were inside the house, and they only had one vehicle. Doll did not call 911 because Defendant had detailed what would occur if she did, and it involved shots being fired. When asked why she did not leave after the second shot was fired, Doll stated: "Because there is a whole arsenal of guns and plenty of ammunition and nothing but woods around me to sit there and wait while he was out of his mind. And he was very clear about me leaving his home." Doll claimed Defendant was in the militia.[2]

---

[2] The transcript says "Malacia," which we assume is a typo.

Doll was asked about her mental health and testified that at one point she was diagnosed with bipolar disorder and depression. However, therapy indicated her bipolar diagnosis was probably inaccurate. Doll was also asked about whether she told anyone she had multiple personalities.

Doll indicated she knew Nick Bertrand, who had been neighbors with Defendant and Doll for approximately fifteen years. She went to him "after all of this happened because nothing made sense. I actually asked him to come and get my pistol because I didn't understand what was going on other than my pistol kept getting moved and unloaded and the safety turned off. Things were not normal around the house." Doll indicated she also saw Bertrand after she separated from Defendant to ask Bertrand about an incident because she "was not clear on exactly what I was remembering."

When asked what she did on the March date at issue, Doll said she was taking care of her dogs. She further declared:

A. I'm fairly sure, I can honestly say that I remember clearly because nothing made sense.

Q. Have you had problems with your memory before this even [sic], Ms. D[ol]l?

A. Only when things were not clear in the home, beyond that sometimes yes because nothing made sense. And I also had medical conditions that didn't help. I was on enough medications because I thought I was crazy. When the house almost burnt down that was placed on me. So, I went on medications because this does affect my family, my kids.

The event at issue occurred on March 29 or 30, 2020. Doll left the home on May 11 or 13, 2020, called police on June 23, 2020, and gave a statement to police on July 3, 2020. Doll was asked to read her statement to police, which indicated, in part:

And I heard the first gunshot go off, so my only thought was either A, he killed my dogs, which is the only reason that I've stuck around this

9

point, or he'd killed himself. Dumbass me went back. There was a second shot fired when I went back towards the house. When I went around the corner, and at that point the -- in time he had the gun on me. When I got up to the steps he put the gun in his mouth, the fight ensued from there over the pistol. It's loaded 380, it ensued and I finally got the pistole [sic] out of mouth [sic] and then he aimed it in mine. I said, okay fine. We are standing there with pistol [sic] in my mouth ….

She told police there were parts of the events that she did not remember. She was

further questioned about her statement:

Q. All right. This is page five of your statement. The top of it -- read that first line of it, please.

A. "Tried and fought for it and that was once I got ahold of it, I'm not letting it go, I'm not, fuck that."

Q. So what are you talking about there? What did you get a hold of?

A. The pistol in question.

Q. And ya'll [sic] got into physical altercations she asked you about the physical; is that correct?

A. Yes, sir.

Q. Read the third line, your statement.

A. "Just struggling to pull away from him and trying to talk to him and you know, get through to whatever demon had in him. I mean it was --"

Q. She asked you if there was any strikes during the tussle and you said you didn't remember any; is that correct?

A. Honestly I don't think so, I don't remember. There were threats too.

Q. So how long did this struggle go on over this gun, Ms. D[ol]l?

A. Honestly, sir, I was terrified and I could not tell you the amount of time that passed.

Q. Well, can you tell me -- if he had the gun like this in front of him; is that how he had it? One hand, two hands?

A. As I pointed out yesterday, he had it in his mouth and then when he turned it, it was on my mouth. The same way, except for different face.

10

Q.    . . . So, is it at that point you reached up and grabbed the gun?

A.    As near as I can recall.

Q.    Okay. So, you ended up with the gun though, right?

A.    Yes, sir.

Q.    Okay. So ya'll [sic] struggled over the gun, and you can't tell me how long that lasted, but then after that -- she asked you about, "did anybody get hurt, did anybody receive any injuries", "not that I remember". "Okay, do you remember if he did", "no he didn't, other than maybe a bruise, that would be about it". "Okay so you got the gun from him and at what point did you get the from him?" And your answer was?

A.    After I asked to suck his dick.

Q.    So was it after you asked to suck his dick or before or before or after you did suck his dick?

A.    It was during that I was able to retrieve the pistol completely and put it in my hoodie pocket, and he still reached for it.

Q.    Okay. So he -- let me make sure I understand, Ms. D[ol]l. You're saying that during the struggle your hand is on the gun, his hand is on the gun, you make the comment that you make here, "I asked to suck his dick", and it was after you asked him is when you got the gun; right?

A.    Yes.

Q.    Okay. And so -- and if I'm correct in what I read here; you had the gun -- as you got the gun you had it for the rest of the night or you knew where it was. You placed it wherever it was?

A.    Yes, sir.

Q.    And you're answering these questions from the page before, "okay, so you got the gun from him, what did you with it?" And your answer was --

A.    "Sucked his dick to keep him from putting [sic] that fucking gun, because he was determined to get it back."

Q.    "Okay. Where did you put it?"

A.    "In my hoodie pocket." I had a hoodie on, so I stuck it in my pocket and had my hand on it the entire time.

After oral sex, Defendant wanted the gun back.

11

In a phone call made to Doll, Defendant denied pulling a gun on Doll or pointing a gun at her. He, however, admitted to firing a gun into the ground to get her attention. Defendant apologized for his actions. Later in the conversation, the following exchange occurred:

Doll: Because you held me at gun point, Mike.

Defendant: No, Angela, I didn't.

Doll: Yeah, you did, you had that gun in your mouth.

Defendant: I'm sorry, I did, I did that and I'm sorry for it, okay?

. . . .

Defendant: I apologize, I told you, you don't know how sorry I am.

Defendant told Doll he would be going to jail soon. He further stated, "I did this, but you didn't have to file charges."

Angela Trahan testified that Doll called requesting that she stay on the phone while Doll showered. Doll was terrified at that time, and it was difficult for Trahan to understand her. A few days later, Defendant appeared outside Trahan's home. Trahan refused to tell Defendant where Doll was. Defendant said, "I should have shot her when I had the chance." When explaining what had occurred between herself and Defendant, Doll told Trahan she had a weapon in her mouth, and she did not want to die.

Detective Tiffany Maks with the Beauregard Parish Sheriff's Office testified that Defendant was arrested on August 20, 2020, as the result of a complaint made on June 23, 2020. Detective Maks indicated Doll had reported that a gun had been pointed at her face, and then Defendant pointed it at himself. According to Detective Maks, Doll got the gun away from Defendant, put it in her hoodie, and performed oral sex on Defendant. During the sexual encounter, Defendant attempted to get the gun several times. Thereafter, Doll entered the bedroom, and Defendant followed

12

her. They argued more and ended up having sexual intercourse. Detective Maks agreed this was "one constant argument."

Detective Maks interviewed Defendant on July 7, 2020, regarding an event that occurred in March 2020. Defendant admitted he and Doll argued. He initially denied that firearms were involved but eventually said he shot a firearm into the ground. Defendant stated he did this to get Doll's attention and to get her to return home. Defendant reported that Doll was not afraid of him. Defendant ultimately admitted he was angry that Doll left. In his interview, Defendant denied that sex occurred on the night at issue.

Defendant's statement to the police was published to the jury. In that statement, Defendant said Doll was mentally ill and took psych medication. Defendant discussed his divorce and said Doll wanted half of everything. Defendant was asked about an incident that occurred in March. Defendant denied an incident with a firearm occurred. He then said he fired a shot outside a door once, possibly in March. He claimed he did so to get Doll's attention because she ran off. When Doll returned, they argued more. He guessed they made up but denied they had sex. Defendant said there was no reason for Doll to be scared of him. He said he never laid a hand on her or threatened her. Moreover, he would never dream of hurting her. Defendant guessed he fired the gun because he was angry and was trying to get Doll's attention. Thereafter, he put the gun away. He denied her requesting oral sex and indicated they had not had sex in a long time. He also denied forcing Doll to have sex with him. He also denied being a violent person. Defendant said the events at issue did not happen in March but occurred way before that.

Detective Maks testified that Defendant admitted there was an argument, he had a gun, he fired the gun, and he fired the gun out of anger. Detective Maks was further questioned:

Q.     Did he say that he had oral sex?

A.     He denied sex.

Q.     Okay. And how did -- I watching the video -- how did he react when you asked him for the first time if she asked to suck your dick? Did he act surprised? He later said, where did that come from; remember that?

A.     He did say that.

Q.     Were you - go to page ten, please. The first - second time Mr. Suydam is speaking on that page. It says, "I never laid a hand on that woman". Right?

A.     That's what it says.

Q.     I never threatened her life, ever; right?

A.     Correct.

Q.     And then you say, "I mean, I would take that as a threat". "Yeah, I would never hurt that woman, ever". "Explain, okay". "I never laid a hand on that woman". "Okay, I didn't say you did". "I would never dream of hurting that woman". "Listen to me for a second". Hhh -huh". "Why else do it?" "Out of anger, I guess, just trying to get her attention, just trying to get her back in the house were [sic] we can, I mean". So, what happened to the pistole [sic] after you fired the [sic] ground? What was the next thing that happened?" "I put it up". So, he never acknowledged holding a gun to her face, putting it in her mouth or anything like that?

A.     He did not.

Detective Maks acknowledged that a gun was pointed or fired or both, and Doll was afraid of being shot.

Doll called Nick Bertrand in March 2020 and asked him to hold her 380 Ruger pistol, which he did.  He returned the gun ten days later.

Regina Nicol testified that Defendant was her future brother-in-law, and she had known him for six years.  Nicol indicated that in the latter part of 2019, Doll told her Defendant raped her at gunpoint.  Nicol further testified that Doll said she was "going to stick it to Mike, and she was going to say her raped her."

14

Officer Quincy Buckley of the Beauregard Sheriff's Department testified regarding Doll's complaint that OnStar did something to her vehicle, including locking and unlocking doors, making the alarm go on and off, and turning the engine on and off. OnStar could not determine where the connection was coming from but did indicate that the OnStar application could not disable the vehicle while it was being driven and could not start the vehicle. This occurred in August of 2020.

The issue raised herein is whether the State proved Defendant had the specific intent to commit the offense of which he was convicted. We have found no cases addressing the sufficiency of the evidence to prove attempted aggravated assault with a firearm.

In *State v. Blaise*, 504 So.2d 1092, 1094 (La.App. 5 Cir. 1987), Ms. Bailko and Mr. Bernard testified the defendant in that case was holding a gun when he entered the bar. Ms. Bailko further stated the defendant was brandishing the pistol when he entered. The fourth circuit concluded this was sufficient to prove the general intent to scare mental element of aggravated assault. In *State v. Connors*, 432 So.2d 308, 311 (La.App. 5 Cir. 1983), the court concluded that an assault occurred when the defendant intentionally raised the gun "as if to aim it" and thereby placed the victim in reasonable apprehension of receiving a battery. In *State v. Major*, 19-621 (La.App. 1 Cir. 11/15/19), 290 So.3d 1205, *writ denied*, 20-286 (La. 7/31/20), 300 So.3d 398, the first circuit concluded the act of pointing a weapon at another person and threatening bodily harm was sufficient to establish the general intent element of aggravated assault.

Defendant indicated he was angry because Doll left and, therefore, fired a gun twice. According to Doll, Defendant subsequently placed the gun in his mouth and then pressed the gun against Doll's lips. Based on the above-cited cases, pointing a gun at Doll is sufficient to prove general intent to commit an assault. We also find

15

that pointing a gun at Doll and touching her on the lips with the weapon when Doll was trying to take the gun away from Defendant was sufficient to prove Defendant had the specific intent to place Doll in reasonable apprehension of receiving a battery, as specific intent can be formed in an instant.

For these reasons, we find no merit to this assignment of error, and affirm Defendant's conviction for attempted aggravated assault with a firearm.

## ASSIGNMENT OF ERROR NO. 2

In his second assignment of error, Defendant contends trial counsel was ineffective for failing to raise the issue of intoxication as a defense to attempted aggravated assault with a firearm or to request a special jury instruction on the issue of an intoxication defense.

> To establish an ineffective assistance of counsel claim, a petitioner must show that: (1) his defense counsel's performance was deficient, which requires a showing that counsel's errors were so serious that he failed to function as that "counsel" guaranteed by the Sixth Amendment; and (2) the deficient performance so prejudiced the defense that the defendant was deprived of a fair trial, which is one "whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Both showings must be made before it can be found that the defendant's conviction "resulted from a breakdown in the adversary process that render[ed] the trial result unreliable." *Id.* The proper standard for attorney performance is not perfect assistance. Rather, it is "reasonably effective assistance" of counsel. *Id.*

*State v. Deville*, 22-350, p. 23 (La.App. 3 Cir. 11/23/22), 354 So.3d 99, 112 (alteration in original). "A claim of ineffectiveness is generally relegated to post-conviction, unless the record permits definitive resolution on appeal." *State v. Bright*, 98-398, p. 41 (La. 4/11/00), 776 So.2d 1134, 1157. We find the record is sufficient to review Defendant's claim.

Defendant suggests trial counsel should have raised intoxication as a defense to attempted aggravated assault with a firearm or requested a special jury instruction thereon. Defendant acknowledges he did not provide advanced notice of his intent

16

to assert the affirmative defense of intoxication. However, he suggests the record was replete with evidence of his drug use and intoxication. Moreover:

> [o]nce the jury rejected the charge as billed and started to consider the lesser attempt charge, the lay jury did not know intoxication could have vitiated one of the key elements of attempted aggravated assault with a firearm—specific intent. Since the jury was not armed with this information, they stopped their deliberations at attempted aggravated assault with a firearm. If the jury had been properly instructed, it would have been obvious that aggravated assault was the only viable lesser-included offense.

Therefore, Defendant maintains his trial counsel's failure to ensure the jury was properly instructed was ineffective.

The State claims Defendant's argument is flawed in that the charged offense of aggravated assault with a firearm is a general intent crime to which intoxication is not a defense. The State asserts trial counsel is required to defend against the charged crime, not a responsive offense.

Louisiana Revised Statutes 14:15 addresses intoxication:

> The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:
>
> (1) Where the production of the intoxicated or drugged condition has been involuntary, and the circumstances indicate this condition is the direct cause of the commission of the crime, the offender is exempt from criminal responsibility.
>
> (2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.

Louisiana Code of Criminal Procedure Article 726 (emphasis added) provides for notice of a defense based upon mental condition:

> A. If a defendant intends to introduce testimony relating to a mental disease, defect, or *other condition* bearing upon the issue of *whether he had the mental state required for **the offense charged***, he shall not later than ten days prior to trial or such reasonable time as the court may permit, notify the district attorney in writing of such intention and file a copy of such notice with the clerk. The court may for cause

shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other orders as may be appropriate.

B. If there is a failure to give notice as required by Subsection A of this Article, the court may exclude the testimony of any witness offered by the defendant on the issue of mental condition.

"Intoxication is an 'other condition' bearing on the issue of whether the defendant had the mental state for *the offense charged*." *State v. Trahan*, 576 So.2d 1, 6 (La.1990) (emphasis added). Based on La.Code Crim.P. art. 726(A) and *Trahan*, whether intoxication is available as a defense is determined based on the offense charged.

There was no evidence of involuntary intoxication in this matter, and "voluntary intoxication can be considered as a defense only in cases where specific intent is a necessary element of the crime." *State v. Boleyn*, 328 So.2d 95, 98 (La.1976). The charged offense of aggravated assault with a firearm is a general intent crime. Accordingly, an intoxication defense would have been improper in this case. *State v. Frank*, 549 So.2d 401, 407 (La.App. 3 Cir. 1989). Thus, counsel was not ineffective for failing to raise an intoxication defense or request a jury instruction on intoxication.

For these reasons, this assignment of error lacks merit.

**ASSIGNMENTS OF ERROR NO. 3 & 4**

In his third assignment of error, Defendant contends the four-year hard labor sentence for attempted aggravated assault with a firearm is constitutionally excessive. In his fourth assignment of error, Defendant contends trial counsel was ineffective for failing to file a motion to reconsider sentence to preserve his statutory right to seek review of the trial court's sentence. Defendant alternatively suggests this case be remanded for a hearing on the issue of counsel's ineffectiveness.

Inasmuch as these issues relate to Defendant's sentence, we will address them collectively.

Defense counsel made a general objection at the time sentence was imposed. However, no motion to reconsider sentence was filed. "The failure to timely file a written motion to reconsider sentence or to orally urge any specific ground for reconsideration at sentencing precludes a defendant from objecting to the sentence imposed." *State v. Barling*, 00-1241, p. 10 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1041, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331. Louisiana Code of Criminal Procedure Article 881.1 serves as the basis for this proclamation and provides, in pertinent part:

> A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
>
> . . . .
>
> B. The motion shall be oral at the time of sentence or shall be in writing thereafter and shall set forth the specific grounds on which the motion is based.
>
> . . . .
>
> E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

"In cases where courts have held that an oral objection alone is sufficient to preserve the issue for review, the oral objection contained the basis for the motion, such as excessiveness of sentence." *Barling*, 779 So.2d at 1041–42. When there is no basis for the objection, the court is relegated to a bare claim of excessiveness. *Id.* at 1042. Thus, Defendant would receive a bare excessiveness review of his sentence based on defense counsel's general objection. However, in brief to this court, Defendant

raises several claims regarding his sentence that would not be addressed in a bare excessiveness review.

In support of his claims, Defendant suggests the nature of the crime and his minor criminal history are evidence that his four-year sentence is excessive. Defendant notes there was no pre-sentence investigation (PSI) or mention of his criminal history at sentencing. Defendant avers the appellate record includes a rap sheet that shows a 1996 conviction for second offense possession of marijuana, which would be a misdemeanor under the current law, for which he received a suspended sentence and three years of probation. Moreover, there was no evidence that he "was terminated from probation." Thereafter, Defendant addresses the facts of the case. He claims the offense was a one-time event, he showed no intent to harm Doll prior to her trying to prevent him from harming himself, and Doll did not testify that he threatened her at the time he pointed the gun at her. Furthermore, he expressed remorse for what his addiction caused him to do and the loss of his family.

Defendant next addresses defense counsel's failure to file a motion to reconsider sentence or voice a specific objection to the sentence. He suggests counsel had no strategic reason for failing to file a motion to reconsider given the objection to the sentence at the time it was imposed, the lack of a PSI, and the trial court's failure to mention or consider the sentencing factors set out in La.Code Crim.P. art. 894.1. In addressing statements made by the trial court at sentencing, Defendant claims he was in Arkansas because he lost his home due to a hurricane and was caring for his mother while there, he missed a court date because he had COVID-19, there was no mention of his criminal record and whether he complied with probation, and the trial court's discussion regarding his failure to return to Louisiana for a probation hearing was muted by the fact that his probation would

20

have to be transferred to Arkansas. Defendant further suggests the trial court failed

to consider the following:

> Michael Suydam was a felon for the first time in nearly thirty years. Clearly, he has some substance abuse problems he must control, but when he is not using, he does not appear to have a problem. He was sixty years old at the time of sentencing. He was the sole caregiver for his ill, elderly mother. "The imprisonment of the defendant would entail excessive hardship to himself or his dependents." La. C. Cr. P. art. 894.1(8)(31). Suydam expressed what appeared to be genuine remorse for the pain he caused, even if he did not remember what happened.

In *State v. Doucet*, 09-1065, pp. 6–7 (La.App. 3 Cir. 5/5/10), 36 So.3d 1105,

1110–11 (third alteration in original), *writ denied*, 10-1195 (La. 12/17/10), 51 So.3d

19, this court discussed ineffective assistance of counsel for failure to file a motion

to reconsider sentence as follows:

> [W]hen the record contains sufficient evidence to address the ineffective assistance of counsel issue, this court examines "whether there was a reasonable probability that the trial court would have reduced" Defendant's sentence if Defendant's trial counsel made or filed a motion to reconsider sentence. [*State v. Blake*, 03-1465 (La.App. 3 Cir. 5/5/04), 872 So.2d 602] at 608 (citing *State v. Prudhomme*, 02–511 (La.App. 3 Cir. 10/30/02), 829 So.2d 1166, *writ denied*, 02–3230 (La.10/10/03), 855 So.2d 324).

> When the defense counsel fails to file a motion to reconsider sentence, Defendant may have a claim of ineffective assistance of counsel when Defendant "can show a reasonable probability, but for defense counsel's error, his sentence would have been different." *Prudhomme*, 829 So.2d at 1177 (citing *State v. Texada*, 98–1647 (La.App. 3 Cir. 5/5/99), 734 So.2d 854). Moreover,

>> [a] claim of ineffective assistance of counsel is properly raised in an application for post-conviction relief. This allows the trial judge an opportunity to order a full evidentiary hearing on the matter. *State v. Burkhalter*, 428 So.2d 449 (La.1983). However, where the record contains evidence sufficient to decide the issue and the issue is raised by an assignment of error on appeal, it may be considered. *State v. James*, 95-962 (La.App. 3 Cir. 2/14/96); 670 So.2d 461.

*State v. Francis*, 99-208, pp. 10-11 (La.App. 3 Cir. 10/6/99), 748 So.2d
484, 491, *writ denied*, 00-544 (La.11/13/00), 773 So.2d 156.

To prove an allegation of ineffectiveness, Defendant must specifically show prejudice. *Blake*, 872 So.2d 602 (citing *State v. Reed*, 00-1537 (La.App. 3 Cir. 3/6/02), 809 So.2d 1261, *writ denied*, 02-1313 (La.4/25/03), 842 So.2d 391). "Whether or not a defendant received ineffective assistance of counsel is a two-part inquiry. First, we must determine whether the trial court would have reduced the Defendant's sentences upon the filing of a 'Motion to Reconsider Sentence.' Second, we must determine whether the sentences were excessive." *Id.* at 609.

The first question to be answered is whether the trial court would have reduced Defendant's sentence had a motion to reconsider sentence been filed. Defendant was convicted of attempted aggravated assault with a firearm. This offense is punishable by a fine up to $5000 and imprisonment with or without hard labor for not more than five years. La.R.S. 14:37.4(C); La.R.S. 14:27(D)(3). Defendant was sentenced to serve four years at hard labor and to pay a fine of $1500.

Defendant called two witnesses at the sentencing hearing held on March 1, 2023. Defendant's mother, Doris Suydam, testified that she lived in Benton, Arkansas. She was in poor health and used a wheelchair. She indicated Defendant was the only person who could help take care of her. She further testified that Defendant did not go to Arkansas to hide, and she was shocked when he was arrested at her home. Ms. Suydam was questioned about Defendant having COVID while in Arkansas. She indicated her address was 418 Jefferson Street in Benton, and Defendant did not live at 416 Jefferson Street despite that address being listed on his COVID test result. Ms. Suydam was unaware that the Sheriff's Office tried to serve Defendant in Benton and could not get in touch with him. In a letter, Ms. Suydam stated that before Defendant was incarcerated on August 8, 2022, Defendant was her caretaker and was living with her during that period.

Defendant's sister, Monica LeBlanc, testified she was at her mother's home when Defendant was arrested. Their father died in May of 2021, and Defendant moved to Benton right after that. LeBlanc indicated Defendant did not complete the

rehabilitation program he entered in New Orleans. The two discussed Defendant's obligation to turn himself in to the Beauregard Sheriff's Department because of his failure to complete the program. According to LeBlanc, Defendant was picked up by police before he could turn himself in. LeBlanc was not aware of any bond conditions imposed on Defendant.

Doll presented a victim impact statement to the court. Thereafter, the trial court filed a letter from defense counsel into the record and left the record open to allow any other letters from counsel concerning the sentence to be received.

Defense counsel's letter addressed sentencing, stating Defendant "had very little if any criminal history and ha[d] been gainfully employed for the majority of his adult life until he was forced to go on Social Security Disability." Defense counsel further stated Defendant had been living with and helping his mother at the time of his incarceration, and both Defendant and his mother hoped he would be placed on probation and that probation could be transferred to Benton, Arkansas. Counsel asserted Defendant was remorseful, and it was clear from his statement to police that he did not have a "great recollection of the events and I'm sure that's because of ingesting some kind of intoxicant."

After the hearing, the State also filed what it labeled an informal sentencing memorandum. Therein, the State asked that Defendant not be placed on probation, noting he was offered a partially suspended sentence but refused to accept a favorable felony plea proposal. The State averred Defendant's actions were deliberately cruel, and the offense was a crime of violence. The State noted that Defendant had previously been given the opportunity to participate in a rehabilitation program, but his failure to complete the program showed he was not ready to accept responsibility for his actions or become accountable to himself and others. Moreover, Defendant failed to comply with the conditions of his bond when

23

he moved to Arkansas. The State alleged Doll and her family members would be at undue risk during a period of any suspension of sentence or probation. The State asked for imposition of the maximum sentence.

At proceedings held on March 9, 2023, defense counsel informed the trial court that Defendant wanted to read a statement to the court. The court responded:

> Well, I thought that's why we had the sentencing hearing . . . . I'm ready to sentence him and it's going to have no effect, but he can read whatever he'd like today. But the sentence has already been prepared and I'm ready to proceed because we had a sentencing hearing at his request. But he can read it.

In that statement, Defendant indicated the events that occurred were his fault, and he had very little memory of that night. He also apologized to the victim. Defendant further indicated that he had been clean and sober for quite some time. He also asked for the opportunity to take care of his ailing mother.

The trial court gave the following reasons for the sentence it imposed:

> On March 1, 2023, a sentencing hearing was scheduled before this Court. Two family members testified on behalf of the defendant, and counsel for the defendant wrote a letter. I understand and I'm sympathetic to Ms. Suydam, the defendant's mother, a resident of the State of Texas [sic] , that testified. The defendant's mother is clearly in need of her son to be present to care for her and to assist her and [sic] addressing her unfortunate health challenges.

> It is unfortunate that her need for her son falls at a time when he is a defendant in a criminal matter. Her daughter, who also testified, voluntarily cares for another person, as opposed to her mother but renders some support to her mother. That testimony, while presented at the sentencing hearing, and again, I would say reiterated today by the defendant, indicates the desire of the family for the defendant. It is not uncommon for this Court to hear the personal reasons why the family prefers their loved one to have one sentence over another. And in this instance, the family's desire, according to the counsel's letter, also his desire, for the Court to place him on probation so is [sic] to allow him to go to Arkansas, as he no longer has a residence in Louisiana.

> I also heard from the victim, Angela D[ol]l, who read her victim impact statement into the record, and it has been filed. It reflects a man that at one time was her loving husband but had a reversal in that role to become violent. Based on evidence heard at the trial, the reversal was

24

likely due to substance abuse. As this Court is aware, substance abuse and guns result in unfortunate circumstances.

The past actions of Michael Suydam indicate to this Court that the defendant would likely not fare well on a probated sentence. In the past the defendant failed to follow Court orders. Mr. Suydam requested through his first attorney, Terry Fowler, to be allowed to go to Teen Challenge, he failed to remain there. He absconded from there after only six days and failed to report this to any authority, although Teen Challenge immediately reported it to the Court and a warrant was issued, upon which three days later after leaving Teen Challenge, the defendant was arrested.

On July 22, 2022, the defendant was contacted personally by the -- the defendant contacted personally the Beauregard Parish District Attorneys [sic] Office indicating he was positive for COVID and would not be at his specially set trial date for July 25th. It was at this time that it was learned the defendant was living out of State and in violation of Louisiana Code of Criminal Procedure Article 320.

Defendant's attorney at that time, Robert Lounsberry was given notice of this in open court on July 25, 2022, and a [sic] arrest warrant was issued. Knowing this arrest was outstanding, the defendant was given ample opportunity to return voluntarily to Louisiana, after being informed he was in violation of his bond. However, six weeks later he was arrested and extradited back to the State of Louisiana arriving at our jail on September 11, 2022, where he has remained.

The defendant, while on bond, was not working but receiving Social Security Disability. Testimony at trial indicated the defendant had been a crane operator, but apparently lost his job prior to the matter before the Court due to substance abuse.

Based on this history of the defendant, and a pattern of refusing to comply with the Court's order, this Court finds that it is unlikely that the defendant would comply with this order of probation. If ordered to return her [sic] for probation hearing, I do not know that he would return because based on past history he had to be arrested to return here, to the Court twice.

This Court is convinced that he would not appear. In this case to grant the defendant's plea through his counsel and family to place him on probation and allow him to move Arkansas [sic], outside this jurisdiction would not be punishment, it is simply giving him his way and I believe he would fail to appropriately account to his probation officer or the Court in this situation.

Mr. Suydam is sixty years old, he's already been given a chance for drug rehabilitation, I'm happy to hear he took it upon himself to do that and I hope that is correct. He will have to make that choice; the Court will no longer be able to do that for him.

25

At this time, based on the factors stated here in [sic] incarceration seems to be the appropriate punishment considering the above reasons.

Reviewing the record, we cannot say there was a reasonable probability the trial court would have reduced Defendant's sentence if a motion to reconsider sentence had been filed. The trial court noted this was a crime of violence and that Defendant fired the gun twice during the incident, specifically commenting that "substance abuse and guns result in unfortunate circumstances." The trial court also specifically noted Defendant was given ample opportunity to return voluntarily to Louisiana, but even after being informed he was in violation of his bond he chose not to return and was arrested six weeks later in Arkansas. The trial court concluded that the past actions of Defendant "indicate to this Court that the defendant would likely not fare well on a probated sentence" and that "incarceration seems to be the appropriate punishment."

The law is clear that a "trial judge need not articulate every aggravating and mitigating circumstance outlined in art. 894.1, the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983). Additionally, the trial court is not required to order a presentence investigation report. La.Code Crim.P. art. 875(A)(1); *State v. Peterson*, 96-1663, p. 18 (La.App. 3 Cir. 6/4/97), 696 So.2d 211, 222, *writ denied*, 97-1742 (La. 11/26/97), 703 So.2d 644. Looking at these general principals, coupled with the trial court's stated reasons for sentence, we cannot say the trial court likely would have reduced Defendant's sentence had a motion to reconsider sentence raising the issues suggested by Defendant been filed.

We also find no merit to Defendant's argument that his sentence is excessive.

Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). The trial court has wide discretion in the imposition of

26

sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Barling*, 00–1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042–43 (citing *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99), 746 So.2d 124, *writ denied*, 00–165 (La. 6/30/00), 765 So.2d 1067).

. . . .

"[Louisiana] Const. art I, § 20, guarantees that, '[n]o law shall subject any person to cruel or unusual punishment.' " *Barling*, 779 So.2d at 1042–43. "To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering." *Id.* at 1042 (citing *State v. Campbell*, 404 So.2d 1205 (La.1981)).

The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *Barling*, 779 So.2d at 1042–43 (citing *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, *cert denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996)). In reviewing the defendant's sentence, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99–433 (La. 6/25/99), 745 So.2d 1183. "[T]he appellate court must be mindful that the trial court is in the best position to consider the aggravating and mitigating circumstances of each case. . . ." *State v. Williams*, 02-707 (La.App. 3 Cir. 3/5/03), 839 So.2d 1095, 1100 (citing *Cook*, 674 So.2d 957).

*State v. Rexrode*, 17-457, pp. 3–4 (La.App. 3 Cir. 11/15/17), 232 So.3d 1251, 1253–54 (alterations in original). Attempted aggravated assault with a firearm is a crime of violence. La.R.S. 14(2)(B)(33). Testimony revealed Defendant put the gun to Doll's mouth, after previously firing two shots as Doll was initially walking away. Defendant acknowledged he was under the influence of intoxicants during the entirety of the incident.

Although Defendant's sentence of four years is in the upper spectrum of the sentencing range, it was not the maximum sentence. The jurisprudence is well settled that "[t]he trial judge is given great discretion in the imposition of sentences

within statutory limits, and the sentence should not be set aside in the absence of abuse of his discretion." *State v. Bradley*, 414 So.2d 724, 725 (La.1982) (citations omitted). The relevant question is simply "whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Cook*, 95-2784, p. 3 (La. 5/31/96), 674 So.2d 957, 959 (per curium) (quoting *State v. Humphrey*, 445 So.2d 1155, 1165 (La.1984)), *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996). We cannot say the sentence imposed is an abuse of the trial court's discretion nor is it disproportionate to the severity of the offense and the specific violent facts of this case.

## DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**